IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| M.D., individually and on behalf of her minor child, J.D., | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Civ. No. 11-00289 ACK-RLP ) |
| STATE OF HAWAII, DEPARTMENT OF EDUCATION and KATHRYN MATAYOSHI, in her official capacity as Acting Superintendent of the Hawaii Public Schools, | ) ) ) ) ) ) |
| Defendants. | ) ) |

<u>ORDER AFFIRMING THE FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND DECISION OF THE STATE OF HAWAII'S
OFFICE OF ADMINISTRATIVE HEARINGS</u>

For the foregoing reasons, the Court AFFIRMS the Findings of Fact, Conclusions of Law, and Decision of the State of Hawaii's Office of Administrative Hearings.

<u>I.   PROCEDURAL BACKGROUND</u>

This case comes before the Court on review of a decision of the State of Hawaii's Office of Administrative Hearings concerning the due process hearing brought by J.D. ("Student"), through his mother, against the State of Hawaii's

-1-

Department of Education.  The hearing concerned an IEP that had been developed in June 2009 for Student, who is currently 12 years old and is eligible for special education and related services under the IDEA pursuant to the category of Autism.  (See Admin. R. Resp't's Exs. 1, 2.)  The court has jurisdiction pursuant to 20 U.S.C. § 1415(i).

On April 29, 2011, in Civil No. 11-00289 ACK-RLP, Plaintiffs filed a complaint against Defendants the State of Hawaii, Department of Education ("State DOE"), and Kathryn Matayoshi, in her official capacity as Acting Superintendent of the Hawaii Public Schools (collectively, "State Defendants" or "State").[1/]  Plaintiffs' principal allegation is that the State Defendants have violated certain provisions of the Individuals With Disabilities Act (hereinafter, "IDEA"), 20 U.S.C. § 1415(e)(2).  Specifically, Plaintiffs contend that the State Defendants denied Student a free appropriate public education ("FAPE"), in violation of the IDEA.

---

[1/] Matayoshi was appointed as superintendent effective September 13, 2010.  See Meet the Superintendent, http://doe.k12.hi.us/about/meet_kmatayoshi.htm.

## II.  FACTUAL BACKGROUND[2/]

The factual background is set forth in detail in the administrative hearings officer's decision.  (See Admin. R. Ex. 12 ("Admin. Decision")at 3-16.)  The parties have not challenged the officer's factual findings.  The Court will highlight some of the relevant facts in this section, but does not intend to reject any of the factual findings that the administrative hearings officer made.  Neither party has requested to submit any additional evidence.

Student attended Kaimuki Christian School ("Private School") from pre-school until the second grade.  In July 2008, Student began attending Kaahumanu Elementary School ("Home School") as a third grader.  He remained at the Home School until February 2010, when Mother removed Student from the Home School. In June 2010, Mother re-enrolled student at the Private School, where he remained a student at the time of the filing of the Complaint.

At the beginning of the 2008-2009 school year, the Home School agreed to retain providers for Student who were originally hired by Mother, in order to facilitate Student's transition to the Home School.  Id.  Within a few months, several of these

---

[2/] The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings.

-3-

providers decided to leave for various reasons.  One
paraprofessional stated that she was declining the assignment
after she was asked to be videotaped while working with Student
in Mother's home.  Id.  Another paraprofessional was replaced at
Mother's request, and others left for personal reasons.  Id.
Rather than accepting Mother's request that the Home School
maintain multiple paraprofessionals for Student, the Home School
decided to assign one behavior instructional support services
provider ("BISS") and one skills trainer ("ST") for Student in
order to provide a degree of consistency in the strategies used
on Student; Student's former BISS and ST were retained and
assigned to work with Student at the Home School.  Id.

Starting in 2008, the Home School held monthly
educational team meetings to discuss Student's progress and share
data, among other things.  Id. at 6.  Although Mother was
invited, she only attended one meeting.  Id.  Student's former
BISS eventually decided to leave Student's case voluntarily after
Mother requested that Home School replace both the former BISS
and the ST in or about December 2008.  Id.

Mother retained a psychologist to observe Student in
the classroom during the 2008-2009 school year, whose report
concluded, among other things, that she had "never seen a more
proficient teacher" than the one in Student's classroom.  Id. at
4.  The psychologist also noted to Student's teacher that there

was a conflict between Mother and Student's former BISS (who
worked with Student from 2008 until approximately June 2009).
Id. at 4-5.  When Student's former BISS contacted Mother to
arrange parent counseling sessions, Mother did not respond or
schedule any sessions.  Id. at 5.  In addition, in or about
October 2008, the ST and former BISS reported observing Mother
using techniques with Student including straddling him and
pushing his head into a book.  Id.  Mother denied this
allegation.  Id.

On June 8, 2009, Mother met with the Individualized
Education Program team (the "IEP Team") to develop Student's IEP.
Id. at 7.  The team developed an IEP that included many detailed
goals across various areas in which Student exhibited difficulty,
including Language Arts, Math, Health, and World Languages.  Id.

One of the goals that ST focused on was developing
Student's independence from ST and fostering Student's dependence
on his teacher and classmates.  Id. at 8-9.  This goal of
independence was discussed between Student's BISS and fourth
grade teacher, and as a result the ST started to gradually move
away from Student to the back of the classroom rather than sit
next to him.  Id. at 9.  As a result, Student's fourth grade
teacher observed, "[Student] would have a partner, a buddy every
week, and so he learned to not depend so much on [the ST] but
learned more to depend on, you now, the peer."  Id.  Mother

-5-

disagreed with this approach and wanted the SST to remain continuously with Student.  Id.

The Home School agreed to Mother's request to replace Student's BISS in July 2009.  However, only a few months after the new BISS started her assignment, Mother stopped responding to the new BISS's attempts at contact.  Id. at 8.  The Home School did not agree to Mother's request to replace the ST, however, because Student's new BISS felt that the current ST was a "good fit" for Student and because "IEP goals were being met or he was progressing in his IEP goals, essentially meeting them later on, meeting goals."  Id.

Mother also complained that ST spent her time with a sick child rather than with Student while on a class field trip to the Polynesian Cultural Center during the fourth grade.  Id. at 9.  Mother was a volunteer chaperone on the school trip, and was assigned by Student's fourth grade teacher to keep an eye on a student who was on the "energetic side."  Id.  Mother, however, focused her attention on Student.  Id.  Student's fourth grade teacher, after reminding Mother to help with the "energetic" student, told Mother that if she wanted to remain with Student, the fourth grade teacher would need to have ST help with the rest of the students.  Id.  Later, during the trip, another student became ill and was vomiting, and the fourth grade teacher asked ST to stay with the sick student.  Id.  ST added that it had been

difficult for her to work with Student because Mother was giving ST orders and the Student "would act up even more" in Mother's presence.  Id.  This was the reason, the ST explained, that the fourth grade teacher switched roles.  Id.

Eventually, Mother asked Student's BISS to leave Student's case.  However, Student's BISS declined this request. Id. at 10.

During both his third grade year and fourth grade years at the Home School, Student exhibited progress across various areas, including socialization.  Id. at 11, 12, 15.  ST and substitute skills trainers regularly documented Student's progress in data sheets, and a progress report was prepared based on the analysis of Student's data from monthly service plans and data received from the skills trainers.  Id. at 10.  At the end of third grade, Student's teacher observed progress in Student's socialization with peers.  Id. at 11.  Student's fourth grade teacher similarly noted Student's progress in socialization skills, noting that Student "was at first very apprehensive to talk to his peers.  But as the year progressed . . . he became more confident and . . . was then able to provide help sometimes to his classmates."  Id. at 12.

The Home School made data and analyses on Student available to Mother after she requested this information.  The Care Coordinator confirmed that the Home School provided Mother

with the data sheets she had requested; the Care Coordinator,
Home School Principal, and the Student Services Coordinator had
provided Mother with data sheets, and a second set of the
Student's records were copied and left at the office for months,
although Mother did not retrieve them. Id. at 13. Further, the
data collection sheets prepared by the ST between January and
February of 2009 were provided to Mother in February or March
2009. Id.

Mother also expressed concerns regarding the provision
of speech-language therapy services to Student. (See June 2009
IEP, Resp's Ex. 2, at JD033.)[3/] During the first quarter of the
2009-10 school year, the Speech-Language Pathologist provided
Student with 1090 minutes of services, including 910 minutes of
direct 1:1 service. See Admin. Decision at 14. Student also
missed 70 minutes of available speech-language therapy services
during this quarter because Mother decided not to take Student
out of his core classes and asked that Student not be taken out
of his other classes. Id. During the second quarter of 2009-10,
the Speech-Language Pathologist provided Student with 1155
minutes of services, including 1005 minutes of direct 1:1
service. Id. Finally, during the third quarter of the 2009-10
school year, the Speech-Language Pathologist provided Student

---

[3/] The language concerning Speech-Language services is
discussed in detail below, in section V.A.ii.

with 395 minutes of direct 1:1 service before Mother removed Student from the school in February 2010.  Id.  Student's Speech-Language Pathologist prepared data collection sheets of Student's progress from August 2009 through February 2010.  Id. at 15. From the data she collected, SLT concluded that Student was making progress, and that in some of the goals he was "able to perform some of the tasks with a hundred percent accuracy, with no prompts, so independently."  Id.

By 2009, teachers observed improvement in Student's behavior and performance in all subject areas.  Id.  By November 2009, the Speech-Language Pathologist noted improvement in Student's speech, including: "initiates conversations, able to sequence routine and explain what he is doing; and catching on the verbal vocabulary (space, etc.)."  Id.  By January 2010, Student was more vocal when asking for help, more responsive to his peers, able to function well with a substitute paraprofessional or substitute teacher, and responded well to prompting from a paraprofessional or a teacher when he was zoning.  Id.  However, Mother's decision to pick Student up early from his after-school program "made it difficult for teachers and aides to have Student complete his work."  Id.

Student left the Home School in February 2010, and enrolled in the Private School in June 2010.  Student has done "extremely well" at the Private School in both his behavior and

-9-

academics, and is on par with the other fourth graders with the help of his ST.  Id. at 16.

Mother's various concerns about the provision of services to Student at the Home School, and State Defendants' responses, are documented in a voluminous set of correspondence. (See Resp't's Exs. 10-25.)  Mother ultimately requested a due process hearing, seeking reimbursement for the cost of the Private School and asserting that Student's placement at the Private School was appropriate because State Defendants failed to provide Student with a FAPE at the Home School.

The central document at issue in this case is the June 8, 2009 IEP (the "June 2009 IEP").  Plaintiffs assert that the June 2009 IEP was not faithfully implemented in a significant manner, and seek reversal of the administrative hearing officer's decision based upon these issues.  Specifically, Plaintiffs contend that the IEP was flawed and/or was not properly implemented with regard to the following:  (1) Student's 1:1 aide failed to address student's academic goals, and only focused on behavioral issues; and (2) the language used to describe provision of speech/language therapy repudiated the IEP team's agreement on the frequency of speech therapy.  (Pls' Br. at 4-11.)

In the Administrative Decision, the Hearings Officer considered these additional arguments raised by Plaintiffs

regarding alleged flaws in the IEP:

> (1) Direct 1:1 aide worked as classroom aide at times, and not directly with Student;
>
> (2) State Defendants' collection and analysis of the instructional and behavioral data was not sufficient to address Student's needs;
>
> 3) The BISS provided for Student was not sufficiently qualified to address Student's needs and to instruct the 1:1 aide;
>
> 4) the IEP states that Speech/Language Therapy can be delivered in a number of ways that would not provide direct instruction and therein potentially affects the agreement of the IEP team for this service, and the direct service frequency in the IEP was not delivered as specified;
>
> 5) parent's ability to participate in the development of the IEP was inhibited when unable to communicate with the direct service providers and get needed documentation on Student's program implementation;
>
> 6) the extended school day program was not implemented due to the failure of State Defendants to address Student's goals during this part of the day, and because Student's direct aides would leave before the program was over for the day;

7) the Extended School Year program should not exclude
the provision of services on holidays, teacher work
days and waiver days;

8) State Defendants failed to implement the IEP on
furlough Fridays; and

9) Student's academic and socialization goals and
objectives were not sufficiently addressed in the IEP.

Admin. Decision at 17-18.

The administrative hearings officer determined that
Plaintiffs failed to establish that Student was not provided an
offer of a FAPE through the June 2009 IEP or that State
Defendants failed to properly implement Student's IEP.  (Admin.
Decision 29.)  The administrative hearings officer also concluded
that Petitioners proved that the Private School program was an
appropriate program for Student.  <u>Id.</u>  Accordingly, the
administrative hearings officer ordered that Petitioners' due
process hearing request be dismissed.  <u>Id.</u>

### III.  STANDARD OF REVIEW

In evaluating an appeal of an administrative decision
under the IDEA, the district court "(i) shall receive the records
of the administrative proceedings; (ii) shall hear additional
evidence at the request of a party; and (iii) basing its decision
on the preponderance of the evidence, shall grant such relief as

the court determines is appropriate."   20 U.S.C. §

1415(i)(2)(C).[4/]

The statutory requirement "that a reviewing court base

its decision on the 'preponderance of the evidence' is by no

means an invitation to the courts to substitute their own notions

of sound educational policy for those of the school authorities

which they review."   Bd. of Educ. v. Rowley, 458 U.S. 176, 206

(1982).   Rather, "due weight" must be given to the findings in

the administrative proceedings.   Id.

A court's inquiry in reviewing administrative decisions

under the IDEA is twofold:   "First, has the State complied with

the procedures set forth in the Act?   And second, is the

individualized educational program developed through the Act's

procedures reasonably calculated to enable the child to receive

educational benefits?   If these requirements are met, the State

has complied with the obligations imposed by Congress and the

courts can require no more."   Id. at 206-07 (footnotes omitted);

see also Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir.

1994).

The amount of deference given to an administrative

_____

[4/] An amendment to the IDEA, effective July 1, 2006,
affected the subsection number at which this provision appears in
the statute, but did not affect the text of the provision.
Compare 20 U.S.C. § 1415(i)(2)(B) (in effect prior to July 1,
2005) with 20 U.S.C. § 1415(i)(2)(C) (effective July 1, 2005).
Thus, the Court's analysis on this issue is identical under
either version of the statute.

hearing officer's findings is a matter of discretion for the
court. See Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d
884, 891 (9th Cir. 1995) (quoting Gregory K. v. Longview Sch.
Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)).   The Court must
"consider the findings 'carefully and endeavor to respond to the
hearing officer's resolution of each material issue,' but the
court 'is free to accept or reject the findings in part or in
whole.'"   Id. (quoting Gregory K., 811 F.2d at 1311).   "When
exercising its discretion to determine what weight to give the
hearing officer's findings," the court may "examine the
thoroughness of those findings" and accord greater deference when
they are "'thorough and careful.'"   Id. (quoting Union Sch. Dist.
v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994)).


## IV.  DISCUSSION

     The Court finds that the administrative hearings
officer's findings of fact and conclusions of law are "thorough
and careful," and therefore accords them significant deference.
Capistrano, 59 F.3d at 891.   Here, the hearing officer's 29-page
decision, which was rendered after three days of hearings,[5]
contains a detailed factual background and analysis.   The
administrative hearings officer explains most of his legal

---

     [5] The hearings took place on January 18, 19, and 20, 2011.
See Admin. R. Tr. Vols. 1-3.

-14-

conclusions and cites specific facts supporting those
conclusions.  See J.W. v. Fresno Unified Sch. Dist., 626 F.3d
431, 441 (9th Cir. 2010); cf. Marc M. v. Dep't of Educ., Hawaii,
762 F. Supp. 2d 1235, 1242 (D. Waw. 2011); C.P. v. Hawaii, Civ.
No. 09-00393 DAE-BMK, 2010 WL 1962944 at *8 n. 7 (D. Haw. May 17,
2010).  Accordingly, the Court gives due weight to the
administrative decision, and affords it particular deference to
the extent that it is "thorough and careful."  The Court will
"summarily dismiss" any "impermissible attempts to second-guess
the [hearing officer's] characterization and weighing of the
evidence."  R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.,
496 F.3d 932, 942 (9th Cir. 2007).]

        The IDEA defines a "free appropriate public education"
as one that, inter alia, is "provided in conformity with the
individualized education program required under section 1414(d)
of this title."  20 U.S.C. § 1401(9)(D).  "[W]hen a school
district does not perform exactly as called for by the IEP, the
district does not violate the IDEA unless it is shown to have
materially failed to implement the child's IEP.  A material
failure occurs when there is more than a minor discrepancy
between the services provided to a disabled child and those
required by the IEP."  Van Duyn ex rel. Van Duyn v. Baker Sch.
Dist. 5J, 502 F.3d 811, 815 (9th Cir. 2007).  The Ninth Circuit
recently affirmed that "[t]he proper standard to determine

whether a child has received a free appropriate public education

is the 'educational benefit' standard set forth by the Supreme

Court in Rowley," and further noted that

> [s]ome confusion exists in this circuit regarding whether
> the Individuals with Disabilities Education Act requires
> school districts to provide disabled students with
> "educational benefit," "some educational benefit" or a
> "meaningful educational benefit."  As we read the Supreme
> Court's decision in Rowley, all three phrases refer to the
> same standard.  School districts must, to "make such access
> meaningful," confer at least "some education benefit" on
> disabled students.  For ease of discussion, we refer to this
> standard as the "educational benefit" standard.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 951 n. 10 (9th

Cir. 2010) (internal citations omitted).

    If a public school fails to provide a FAPE to a

student, and a parent places that student in an appropriate

private school, a court may require the DOE to reimburse the

parents for the private school tuition.  See 20 U.S.C. §

1412(a)(10)(C)(ii); Forest Grove Sch. Dist. v. T.A., 557 U.S.

230, 129 S. Ct. 2484, 2488 (2009).

    To determine the educational benefit, the Court looks

broadly at the academic, social, health, emotional,

communicative, physical, and vocational needs of a student.

Seattle Sch. Dist., No. i. v. B.S., 82 F.3d 1493, 1498 (9th Cir.

1996). Further, an appropriate education "does not mean the

absolutely best or 'potential-maximizing' education for the

individual child." <u>Gregory K.</u>, 811 F.2d at 1314.  Rather, the
state must only provide "a basic floor of opportunity" for the
student.  <u>Id.</u>  Moreover, although a family's preferred schooling
may be more beneficial for the student than the DOE's proposed
placement, this alone does not make the DOE's placement
inappropriate.  <u>Gregory K.</u>, 811 F.2d at 1314.  "'[A] school
district fulfills its substantive obligations under the IDEA if
it provides an IEP that is likely to produce progress, not
regression, and if the IEP affords the student with an
opportunity greater than mere trivial advancement.'"  <u>T.P. v.
Mamaroneck Union Free Sch. Dist.</u>, 554 F.3d 247, 254 (2d Cir.
2009) (citation omitted); <u>N.S. v. Hawaii</u>, Civ. No. 09-00343 SOM-
KSC, 2010 WL 2348664, at *4 (D. Haw. June 9, 2010).

        Further, Plaintiffs have the burden of proof in this
appeal.  <u>Schaffer ex. rel. Schaffer v. Weast</u>, 546 U.S. 49, 62
(2005)("The burden of proof in an administrative hearing
challenging an IEP is properly placed upon the party seeking
relief.").  <u>See also Van Duyn ex. rel. Van Duyn v. Baker Sch.
Dist. 5J</u>, 502 F.3d 811, 820 (9th Cir. 2007) ("Van Duyn, as the
party objecting to the IEP's implementation . . . bore the burden
of proof at the administrative hearing.").

        Plaintiffs' Opening Brief presents two central
arguments, each of which arises out of the June 2009 IEP, which
Plaintiffs assert was "a prototypical example of an IEP that was

an illusion and never faithfully implemented." (Pl.'s Br. 4.)
The 29-page June 2009 IEP presents a wide array of goals for
Student across subject areas including Language Arts, World
Languages, Health, in each case providing measurable annual goals
and stating how Student's progress toward the annual goal will be
measured.  <u>See Admin. R.</u> Resp't's Ex. 2 (June 2009 IEP).
The Court will review the two issues raised by Plaintiffs
regarding the June 2009 IEP in the order presented in their
Opening Brief, and will also consider the additional issues
addressed by the administrative hearings officer in his April
2011 decision.


**A.    Issues Raised in Plaintiffs' Opening Brief**

 **i.    Student's Non-Behavioral Needs.**

  Plaintiffs contend that Student was denied a FAPE
because the student's aide failed to address Student's non-
behavioral needs.  (Pl's Br. 4.)  Plaintiffs assert that although
the June 2009 IEP specified that Student was to receive 1905
minutes each week of "one-to-one adult" services during the
normal school day, designed to help Student "acquire academic
skills and concepts"; the supervisor for the one-to-one aides
"flatly testified that she instructed [aides] to intervene if a
<u>behavioral issue was interfering with Student's academic
performance</u>, not to help Student with his academic skill

development." Id. at 8 (emphasis in original).

Defendants correctly state that Plaintiffs are improperly attempting to raise a new issue on appeal that was not raised below. (See Def's Answering Br. 6.)  Plaintiffs did not complain that the one-to-one aide assisted Student with his behavioral issues – thereby neglecting Student's academic skills – in the underlying administrative proceeding, and it was not considered and decided by the administrative hearings officer. Rather, Plaintiffs advanced a different argument in their Complaint before the administrative hearings officer: that the direct 1:1 aide did not work directly with Student at all times. (See Compl., Resp. Ex. 1 at JD003.)

It was proper for the administrative hearings officer not to consider this issue since only those issues raised in the request for a due process hearing can be properly considered and decided upon by the hearings officer.  County of San Diego v. California Special Ed. Hearing Office, 93 F.3d 1458, 1464-65 (9th Cir. 1996).  See also Marc. M. v. Dep't of Ed., 762 F. Supp. 2d 1235, 1241 (D. Haw. 2011) ("[A]rguments not raised in front of a hearings officer cannot be raised for the first time on appeal to the district court.  Indeed, 'when a plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is required.'") (quoting Robb v. Bethel Sch. Dist. #403,

-19-

308 F.3d 1047, 1048 (9th Cir. 1996); <u>Hailey M. ex rel. Melinda B.</u>
<u>v. Matayoshi</u>, No. 10-00733 LEK-BMK, 2011 WL 3957206, at * 25 (D.
Haw. Sept. 7, 2011) (declining plaintiffs' request to review IDEA
issues that were not raised or considered in underlying
administrative proceeding).

However, as Defendants assert, even if this issue had
been properly raised in the underlying administrative proceeding,
the evidence does not support the conclusion that Student's 1:1
aide failed to address Student's academic needs. Plaintiffs
selectively quote from the hearing testimony of Sharon Tsai, the
supervisor for Student's aides.  (<u>See</u> Pl's Brief 7-8.)  However,
a closer examination of Ms. Tsai's testimony reveals that she
directed Student's skills trainer to intervene with behavioral
problems so that the student could "participate in the academic
activity." (3 Tr. at 303:8-12.)[6]  Further Defendants' Exhibits
contain a multitude of examples of Student's ST documenting
Student's academic process in data collection sheets and daily

---

[6] <u>See also</u> 3 Tr. at 302:25-303:05:

Q:   [by Mr. Peck]  Was there an academic function that [the
     skills trainer] was fulfilling or was it a behavioral
     one?

A.   [by BISS Tsai]  It was a combination.  So behavioral,
     academic, so if there was an academic, but a behavioral
     issue was causing him not to participate in academics,
     then to intervene.

goals sheets.  (See Resp's Exs. 39-48.)  The documents establish

that Student's ST worked with Student on academic goals in

subjects including math, oral communication, reading, and

writing.  Id.[7/]  Accordingly, the evidence establishes that

student's one-to-one aide assisted Student with both behavioral

and academic issues.  Student's voluminous school records,

including progress reports, speech therapy data sheets and

monthly student service plans, among others, establish that

Student's aides closely monitored his progress in both behavior

and academics.  (See, e.g., Resp's Exs. 4, 25-27.)

Furthermore, the record establishes that Student made

progress in both behavior and academics.  Student's Care

Coordinator testified that Student made excellent progress and

mastered many of his goals.  (See 3 Tr. at 405: 3-5.  Student

also improved in the area of behavior; the administrative

hearings officer noted that Student's fourth grade teacher saw

Student display greater independence, an important goal under the

IEP.  Id. at 313-17.

Accordingly, the Court concludes that this issue has

not been raised properly on appeal, but in any event the evidence

_____

[7/] For example, in a data collection sheet for the week of
July 6 - July 12, 2009, Student's ST provides comments on
Student's ability to attain the following academic goal in math:
"Given key math vocabulary words related to computational
operations, [Student] will be able to read the words & state the
computational operation it is related to."  Resp's Ex. 40, at JD
1695.

supports a finding that the administrative hearing officer's decision be affirmed.

### ii. **The Provision of Speech-Language Therapy**.

Plaintiffs' second argument is that the language used to define "speech therapy" in the IEP "acted to repudiate the IEP teams [sic] agreement on the frequency of speech therapy and procedurally and substantively denied Student a FAPE." (Pl's Brief 10.)  Specifically, Plaintiffs contend that the language of the IEP was changed to mean that Student may be given <u>any</u> amount of direct speech therapy, or no actual speech therapy.  <u>Id.</u>

The administrative hearings officer carefully addressed this issue, focusing on the following language from the June 2009 IEP:

> Speech/Language Therapy services will be provided in a variety of delivery systems <u>to include</u>, but not limited to, 1) Individual pull out services to teach and strengthen skills; 2) individual push in (classroom) service to teach and strengthen skill and provide continuity in the objectives; 3) Pull out into small groups to teach and generalize skills; 4) Collaboration with other professionals and paraprofessionals to develop and implement strategies and activities that help reinforce the acquisition of new skills; 5) Observation in a variety of settings to gage [sic] progress and to adjust student's program as needed.

<u>See</u> June 2009 IEP (emphasis added).  The administrative hearings officer concluded that the evidence established that the "vast majority of the Speech-Language Pathologist's time was devoted to providing Student with direct speech-language therapy services."

(Admin. Decision at 22.)  Moreover, Student's Speech-Language
Pathologist, Trissa Walter, testified as to the meaning of this
language:

> As a speech-language pathologist, I want my options open
> because conversation, language, speech is a very, very
> dynamic, ingenerative [sic] discipline.  It just can't
> happen in one spot, in one environment because it doesn't.
> We want these kids to be functional across all environments,
> so that's why I put included, but not limited to, because
> if, for instance, I believe a child, you know, will only do
> well in individual, you know, then I want to only do
> individual, but if I say, wow, he's doing so great with me,
> now I need to take him out and see whether he does this well
> with somebody else.

3 Tr. at 379:18-380:04.  Additionally, the evidence establishes
that Student was actually provided with more speech therapy than
what was required under the June 2009 IEP, which mandates 1080
minutes per quarter of speech-language therapy services.  In
fact, during the relevant time period – the first two quarters of
the 2009-2010 school year – Student received 1090 minutes of
speech-language therapy, 910 minutes of which was direct 1:1
service.  (Admin. Decision at 22; 3 Tr. at 348-355.)  In the
second quarter, Student received 1155 minutes of speech-language
therapy, 1005 minutes of which was direct 1:1 service.  Id.  The
administrative record provides overwhelming evidence that Student
received more than the required speech-language therapy services

mandated under the June 2009 IEP.[8/]

Moreover, the precise methodology to be employed in the execution of an IEP is not a question for courts to decide.  See Rowley, 458 U.S. at 207-08.  According to the Supreme Court, "courts must be careful to avoid imposing their view of preferable educational methods upon the States."  Id. at 207. "The primary responsibility for formulating the education to be accorded . . . and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child."  Id.  "Therefore, once a court determines that the requirements of the Act have been met, questions of methodologies are for resolution by the States."  Id. at 208.

It is not for the Court to decide the exact methodology

_____

[8/] Plaintiffs also claim that the "clarification section" regarding provision of speech/language therapy services was added to the June 2009 IEP after the June 2009 IEP meeting ended and the final IEP was drafted, and "did not represent the discussion of the parties," thereby thwarting the IEP formulation process and leading to a denial of a FAPE.  (See Compl. ¶ 11; see also Pl's Br. at 10.)  As Defendants pointed out during the March 15, 2012 hearing, this identical "clarification section" language was in fact present in an earlier annual IEP dated April 30, 2009, which was mailed to Mother by Valerie Sasaki on April 30, 2009. (Compare April 27, 2009 IEP, Resp's Ex. 13 at JD 757-58, with June 8, 2009 IEP, Resp's Ex. 2 at JD 033.)  Further, during the March 15, 2012 hearing, Plaintiffs' counsel conceded that this language was not, in fact, added after the June 2009 IEP meeting. Accordingly, the Court concludes that Plaintiffs' claim that the addition of the "clarification section" language after the June 2009 IEP meeting thwarted the IEP process and denied Student a FAPE is without merit.

by which State Defendants provided speech-language therapy
pursuant to the June 2009 IEP.   The administrative hearings
officer carefully reviewed the evidence and determined that
Plaintiff failed to prove that Defendant did not implement the
frequency of speech-language services as required by the IEP or
that the failure, if any, was a material failure to implement
Student's IEP.   Accordingly, the Court affirms the administrative
hearing officer's decision.

          Plaintiffs additionally assert that Student was
procedurally denied a FAPE because of the language utilized in
the June 2009 IEP regarding speech-language therapy services.
(Pl's Br. 10.)   Plaintiffs do not specify the nature of this
procedural denial of an FAPE.   The Court notes, however, based
upon the record, that Mother has argued that her ability to
participate in the development of the IEP was inhibited when she
was prohibited from communicating with direct services providers
and was not provided with information regarding Student's program
implementation.   (See Admin. Decision at 22.)   The evidence
establishes, however, that State Defendants regularly
corresponded with Mother and invited her to participate in the
implementation of Student's IEP.   Mother, however, did not
actively participate in many of the educational meetings to which
she was invited   (See Admin. R., Pet's Ex. 3, May 29, 2009
Education Team Planning Meeting ("Aside from student's annual IEP

-25-

meeting, the last monthly team meeting attended by parent was in November 2008."))[9/]

The evidence also establishes that Defendants provided Mother with the educational data and records she requested on a regular basis. (<u>See, e.g.</u>, Def's Ex. 12, March 2, 2009 letter from H. Kiyonaga to Jeffrey K. Okamoto, M.D. (noting that Student's care coordinator, Special Education teacher Valerie Sasaki, often personally hand delivered Student's data reports to Mother as she arrived at school to drop Student off)). Furthermore, regarding Plaintiffs' assertion that Student was also procedurally denied a FAPE, the Court notes that not all procedural failures constitute a denial of FAPE. <u>Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.</u>, 267 F.3d 877 (9th Cir. 2001). Moreover, "[before they can fairly argue that the best the school authorities had to offer was or is not good enough, the critical pre-requisite is that the parents must have cooperated with the school authorities . . . to try to develop the IEP." <u>S.M. v. Weast</u>, 240 F. Supp. 2d 426, 436 (D. Md. 2003).

---

[9/] <u>See also</u> March 1, 2009 Educational Team Planning Notes ("Requests have been made to parents asking for their participation in educational team planning, revision/review IEP meeting and annual IEP meeting.  Parent has not responded in a timely manner.")

### iii. **Appropriateness of Alternative Placement**

Generally, "parents may be awarded reimbursement of costs associated with a unilateral placement" if they establish two elements:  (1) the IEP offered by the school district is <u>not</u> appropriate; and (2) the alternative placement <u>is</u> appropriate. See <u>Sch. Comm. of Burlington, Mass. v. Dep't of Educ.</u>, 471 U.S. 359 (1985). Although the administrative hearings officer concluded that Petitioners proved that the Private School program was an appropriate program for Student, the officer also concluded that Petitioners failed to show that Student was not provided an offer of a FAPE through the June 2009 IEP or that Defendant failed to properly implement Student's IEP.

Upon careful review of the Administrative Record, the Court agrees with the Hearings Officer's conclusions. Plaintiffs failed to establish that the Home School was an inappropriate placement for Student.  In fact, Respondents provide ample evidence of Student's consistent progress in the Home School in all areas of development.  Accordingly, although the administrative hearings officer concluded that the Private School is an appropriate alternative placement, Plaintiffs have failed to establish both factors under <u>Burlington</u>, 471 U.S. 359 (1985). Therefore, the Court concludes that Plaintiffs are not entitled to reimbursement of costs associated with placement in the Private School.

**B.  Other Issues Considered by the Administrative Hearings
Officer**[10]

> **i.  Direct 1:1 aide worked as classroom aide at times, and
> not directly with Student.**

This issue is discussed at length above in Section

V.A.i.  As the administrative hearings officer noted, "an

important goal for Student was to develop greater independence

from the Skills Trainer and to encourage him to work directly

with his regular education teacher and his peers."  Admin.

Decision at 19.  The ST was instructed by Student's BISS to

gradually "back off" in order to facilitate this goal of

independence for Student.  Moreover, as a result of ST's gradual

move away from Student, Student's fourth grade teacher witnessed

Student display greater independence.  Id. at 20.

Furthermore, regarding the ST's purported failure to

attend to Student during the Polynesian Cultural Center, the

administrative hearings officer concluded that the ST was only

assigned to the sick child "after Mother was unable or unwilling

to assist the Fourth Grade Teacher with the class even though she

had volunteered as a class chaperone."  Id.  Finally, regarding

absences, the administrative hearings officer also concluded that

the evidence established that ST would call the Home School on

---

[10] It appears that Plaintiff has not challenged these issues
before this Court, however in an abundance of caution the Court
analyzes these issues in addition to those raised in the
Complaint.

days that she was late and the school would arrange for a

substitute skills trainer for Student.   Id.

These conclusions are supported by the record,

including testimony from student's [BISS and ST].  Moreover, the

precise methodology employed in executing an IEP is not a

question for this Court to decide.   See Rowley, 458 U.S. at 207-

08.


      **ii.  State Defendants' collection and analysis of the
           instructional and behavioral data was not sufficient to
           address Student's needs.**


The Court concurs with the administrative hearings

officer's conclusion that Plaintiffs do not identify any basis in

the record for their claim that State Defendants failed to

collect sufficient data to address Student's needs.   In fact,

State Defendants' five-volume set of exhibits provides

overwhelming evidence of careful and detailed data collection

analysis, including speech/language therapy data, monthly service

plans and reviews, and behavioral health data collection sheets.

See Admin. Rec. Resp's Exs. 25-48.  The Court agrees with the

administrative hearings officer that the Plaintiff provided

insufficient evidence to prove this claim.   See Admin. Decision

at 20.

>  iii. **The BISS provided for Student was not sufficiently
>        qualified to address Student's needs and to instruct
>        the 1:1 aide.**

The Court agrees with the administrative hearings
officer that the evidence does not establish a lack of
qualification for student's BISS.  To the contrary, as the State
Defendants assert in their proposed findings of fact (see
Resp't's Proposed Findings of Fact, at ¶ 18), Plaintiffs'
allegation that Student's BISS was not qualified is directly
contradicted by Mother's May 19, 2009 letter (Resp't's Ex. 14, JD
788) wherein Mother writes that Sharon Tsai has "experience and
qualifications to perform responsibilities for Scope of Service
determined under DOE BISS job description as well as services
determined in Jake's IEP."  Furthermore, a review of Sharon
Tsai's curriculum vitae reveals that she has a Master's degree in
Counseling Psychology, and began practicing one-on-one
instruction to individuals with Autism and/or Asperger's Syndrome
in 2002.  See Resp's Ex. 49i.  The Court concurs with the
administrative hearings officer's finding that there is no basis
to conclude that Student's BISS was unqualified.

iv. **The IEP states that Speech/Language Therapy can be delivered in a number of ways that would not provide direct instruction and therein potentially affects the agreement of the IEP team for this service. In fact, the direct service frequency in the IEP was not delivered as specified.**

The Court addresses this issue at length above in Section V.A.ii, and agrees with the administrative hearings officer's conclusion that Plaintiff has failed to prove that State Defendants failed to implement the frequency of speech-language services as required by the IEP or that the failure, if any, was a <u>material</u> failure.

v. **Parent's ability to participate in the development of the IEP was inhibited when unable to communicate with the direct service providers and get needed documentation on Student's program implementation.**

The Court concurs with the administrative hearing officer's conclusion that the Home School did not act unreasonably in requiring Mother to obtain Home School's permission before visiting Student at school, or in instructing the ST not to speak to Mother and requiring Mother to communicate instead with the Care Coordinator or Student's teacher. <u>See</u> Admin. Decision at 23-24. The record, including Mother's own testimony, establishes that Mother's presence was disruptive to Student's learning and progress.[11] <u>See</u> Admin. Decision at 24.

---

[11] Mother testified that she showed up at the Home School to observe Student "dozens of times" despite the school's request

(continued...)

Additionally, although Mother was invited to monthly meetings with Student's educational team, including the regular education teacher, ST, occupational therapist, the BISS, and the Care Coordinator, she only attended one of these meetings.

Additionally, Plaintiffs have not presented evidence to substantiate their claim that the State Defendants failed to provide Mother with information and documents that were necessary to ensure Mother's participation in the development of the IEP. To the contrary, as the administrative hearings officer noted, the credible evidence suggests that Mother received the requested documents pertinent to the IEP. See Admin. Decision at 24; see also Resp't's Exs. 11, 12, 13 (letters from State Defendants to Mother including documents on Student's progress). The Home School also left a second set of Student's records at the office for Mother, but Mother never picked up these records. Id. at 24. Based upon these facts, the Court concurs with the administrative hearings officer that the record is insufficient to prove Plaintiffs' claim.

_____

11/ (...continued)
that she schedule observations ahead of time. See Admin. Decision at 23.

**vi.  The extended school day program was not implemented due to the failure of State Defendants to address Student's goals during that part of the day, and because Student's direct aides would leave before the program was over for the day.**

The Court agrees with the administrative hearings officer that Plaintiffs failed to provide evidence to establish that the State Defendants did not address Student's goals during the extended school day program.  Furthermore, the precise methodology to be employed in the execution of an IEP is not a question for courts to decide.  See Rowley, 458 U.S. at 207-08. Courts "must be careful to avoid imposing their view of preferable educational methods upon the States."  Id. at 207.

The record also fails to substantiate Mother's claim that skills trainers left early during the extended school day program.  See Admin. Decision at 24.  In fact, the record establishes that Mother chose to pick up Student from the after-school program early and made it difficult for teachers and aides ensure that Student completed his work.  Id.

In light of Student's documented progress across various areas identified in the IEP, compounded by Plaintiffs' failure to provide evidence that State Defendants did not address Student's goals during after-school, the Court concludes that this claim does not give rise to a violation of the IDEA.

> **vii. The Extended School Year program should not exclude
> the provision of services on holidays, teacher work
> days and waiver days.  Student needs these services on
> those days, as well.  It is improper for him not to
> have it.**

Plaintiffs have provided no legal authority – and this

Court is not aware of any – to support the contention that the

Extended School Year program should not exclude holidays ,teacher

work days, and waiver days.  Significantly, Plaintiff's counsel

acknowledged in his closing argument that this claim was a 'de

minimis complaint."  Coupled with the State Defendants' ample

evidence of Student's documented progress in areas addressed in

the IEP, this Court cannot conclude that the exclusion of

services on holidays, teacher work days and waiver days rises to

the level of a material failure to implement Student's IEP.  See

Van Duyn, 502 F. 3d at 822.

> **viii.State Defendants failed to implement the IEP on
> furlough Fridays.  This is not in accord with the IEP
> and repudiates the IEP agreements.**

Plaintiffs have not established that State Defendants'

failure to implement the IEP on furlough Fridays caused a

material failure to implement the IEP, as required to rise to the

level of a violation of the IDEA.

The Ninth Circuit recently held that the reduction of

the school week caused by furlough Fridays did not constitute a

change in the general educational program of a student:  "While

-34-

they certainly assume some five day weeks, the IEPs also assume
that there are some four day weeks when there are federal and
state holidays . . . .  The four day weeks created by the
furloughs are no different and do not constitute changes in
[student's] educational program." N.D. et al. v. State of Hawaii
Dep't of Educ., 600 F.3d 1104, 1117 (9th Cir. 2010). See also
S.M. v. Hawaii Dep't of Educ., 2011 WL 1527068, at *9 (D. Haw.
Apr. 20, 2011) (held: N.D. "forecloses any argument that the
State of Hawaii's decision to implement furloughs, in general,
constituted a denial of a free appropriate public education to
Student.").

        Here, as the administrative hearings officer concluded,
Plaintiffs have not presented evidence that "furlough Fridays"
resulted in any material failure to implement Student's IEP.  See
Admin. Decision at 27.  Moreover, testimony from various teachers
including Student's fourth grade teacher and Speech-Language
Pathologist documents Student's progress across many of the goals
in Student's IEP.  Id.


        ix.  **Student's academic and socialization goals and
             objectives were not sufficiently addressed in the IEP.**

        A review of the June 2009 IEP reveals a detailed plan
at addressing various areas of difficulty for Student, including
Language Arts, Health, and World Languages.  See June 2009 IEP.

-35-

The June 2009 IEP contains more than 30 pages of benchmarks and
short-term objectives for Student.  Id. Furthermore, by November
2009, Student's teachers observed improvement in Student's
behavior and performance in all subject areas, and by January
2010, Student appeared more responsive to his peers and was more
vocal when asking for help.  See Admin. Decision at 28.

        The IDEA does not require perfect adherence to an IEP,
and minor discrepancies between the services called for and those
actually delivered do not give rise to an IDEA violation.  Van
Duyn v. Baker Sch. District, 502 F.3d 811 (9th Cir. 2007).  A
student's educational progress, or lack thereof, may be probative
of whether there has been a significant shortfall that gives rise
to an IDEA violation.  Id. at 822.  "For instance, if the child
is not provided the reading instruction called for and there is a
shortfall in the child's reading achievement, that would
certainly tend to show that the failure to implement the IEP was
material.  On the other hand, if the child performed at or above
the anticipated level, that would tend to show that the shortfall
in instruction was not material."  Id. Clearly, based upon the
evidence Student exhibited improvement across various areas of
learning, which cannot support a finding that there has been a
material failure under the IDEA.

***

The Court finds that the June 2009 IEP was "developed through the [IDEA's] procedures [and was] reasonably calculated to enable [Student] to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). Based on the foregoing and the Court's review of the record, the Court agrees with the administrative hearings officer that Plaintiffs failed to show, by a preponderance of the evidence, that the June 2009 IEP was not reasonably calculated to provide student with "some educational benefit." See Rowley, 458 U.S. at 200; J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947, 951 n. 10 (9th Cir. 2010).

As noted above, "[W]hen a school district does not perform exactly as called for by the IEP, the district does not violate the IDEA unless it is shown to have materially failed to implement the child's IEP.  A material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP." Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 815 (9th Cir. 2007).  The Court concludes that State Defendants have not materially failed to implement Student's IEP, and accordingly finds no violation of the IDEA.

Finally, as a general matter, the Court rejects Plaintiffs' attempts to have the Court substitute its judgment on

-37-

educational policy for the judgment of the school authorities who developed Student's IEP.  See Rowley, 458 U.S. at 206 (explaining that Congress did not "invit[e] . . . the courts to substitute their own notions of sound educational policy for those of the school authorities which they review").

### V.   CONCLUSION

For the foregoing reasons, the Court AFFIRMS the administrative hearings officer's Findings of Fact, Conclusions of Law, and Decision.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, March 29, 2012.



_____
Alan C. Kay
Sr. United States District Judge


M.D., et al. vs. State of Hawaii, Dep't of Educ., et al., Civ. No. 11-00289 ACK-RLP:  Order Affirming the Findings of Fact, Conclusions of Law, and Decision of the State of Hawaii's Office of Administrative Hearings.